UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ELIZABETH MARSHALL,              )
                                 )
            Plaintiff            )
                                 )
        v.                       )   Case No. 2:06 cv 264
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security  )
                                 )
            Defendant            )

<u>OPINION AND ORDER</u>

This matter is before the court on the Petition for Judicial Review of the Decision of the Commissioner of Social Security filed by the plaintiff, Elizabeth Marshall, on December 7, 2006. For the reasons set forth below, the decision of the Commissioner is **REVERSED** and **REMANDED**.

<u>Background</u>

The plaintiff, Elizabeth Marshall, first applied for Social Security disability benefits and Supplemental Security Income (SSI) on May 23, 2001, alleging a disability onset date of May 15, 2001. (Tr. 260-263)  These claims were denied on August 16, 2001, and no further action was requested. (Tr. 264-268)  Marshall reapplied for SSI and Disability Insurance Benefits (DIB) on January 6, 2004. (Tr. 52-54, 270-273)  These claims were denied initially on March 30, 2004, and upon reconsideration on June 24, 2004. (Tr. 274-278, 27-30, 280-281, 33-34)  A hearing before an Administrative Law Judge (ALJ) was requested on August 18, 2004. (Tr. 36)  On December 15, 2005, a hearing was held

before ALJ Paul Armstrong at which Marshall, medical expert Dr. Walter Miller, and vocational expert Pamela Tucker testified. (Tr. 283)  The ALJ denied Marshall's application by written decision on February 10, 2006, and Marshall requested review by the Appeals Council on March 2, 2006. (Tr. 17-24, 12) Following a denial of her request for review by the Appeals Council on May 26, 2006, Marshall filed a complaint in this court on December 7, 2006. (Tr. 4)

Marshall was born on April 23, 1962, making her 43-years-old at the time of her hearing in front of ALJ Armstrong. (Tr. 52) Marshall finished her formal education after graduating from the eighth grade and received her GED in 1986. (Tr. 226)  After ending a relationship with an abusive boyfriend in 1999, Marshall lived at a woman's shelter for about two months, but she resided by herself in a first floor apartment at the time of the hearing. (Tr. 226, 292) Marshall indicated she has a son. (Tr. 291) Before working  as a fast food employee at Rally's Hamburger from 1995 until February of 2001, Marshall worked at a number of different assembly jobs and as a certified nurses assistant. (Tr. 227)  At Rally's, Marshall made sandwiches, took customer orders, and occasionally worked the cash register. (Tr. 293-294)  The job required a significant amount of time standing and some light lifting. (Tr. 293-294)

On February 18, 2001, Marshall, previously diagnosed with diabetes, was admitted to the Methodist Hospital Emergency Room complaining of a cough, congestion, and the chills. (Tr. 111,

2

304)   The emergency room doctor ordered an x-ray of her chest, which indicated that her heart was normal and lungs were clear. (Tr. 116) A drug test revealed Marshall tested positive for cocaine metabolites. (Tr. 114)  Marshall was discharged from the hospital the same day. (Tr. 115)

Marshall returned to the Methodist Hospital Emergency Room on May 16, 2001, after noticing lower extremity and pedal edema and experiencing abdominal swelling and distress. (Tr. 117) The emergency room doctor noted that Marshall also complained of headaches and dizziness. (Tr. 127)  Marshall was admitted to the hospital for further care and evaluation, and she was diagnosed with acute alcoholic hepatitis, cirrhosis of the liver, alcohol dependency, tobacco use disorder, and gastritis. (Tr. 118)  Upon discharge on May 19, 2001, Marshall was prescribed Pepcid and a multivitamin. (Tr. 119-120)

On May 23, 2001, about four days after her second visit to Methodist Hospital, Marshall applied for disability benefits and supplemental income, citing a disability onset date of May 15, 2001. (Tr. 260-262)  In support of her application, Marshall referenced liver problems and chronic hepatitis. (Tr. 263)  The Social Security Administration denied the application on August 16, 2001, because the disability was not expected to prevent employment for 12 consecutive months.  Marshall did not request reconsideration. (Tr. 264-268)

Marshall visited the Methodist Hospital Emergency Room for a third time on June 9, 2001, for swollen feet and nausea. (Tr.

137)   The doctor prescribed Tylenol #3 and instructed her to stop drinking alcohol and to follow a low fat diet, and he scheduled a follow-up appointment. (Tr. 139)

From June 19, 2001 until January 15, 2002, Marshall participated in treatment programs run through Edgewater Systems for Balanced Living. (Tr. 195, 140)   The admissions assessment noted that Marshall reported feeling edgy, frustrated, anxious, and nervous, but it also indicated that she displayed no noticeable handicaps. (Tr. 195) The assessment also indicated that Marshall had used crack cocaine, smoked cannabis, and drank alcohol. (Tr. 195) The report assigned Marshall an Axis V reading of 58 and diagnosed her with poly-substance dependence and adjustment disorder with mixed anxiety and depressed moods. (Tr. 197)   A diagnostic formulation taken by Edgewater on August 1, 2001, assigned a M.A.S.T. score of 18, indicating an evident problem. (Tr. 189) Throughout her time at Edgewater, Marshall attended group and individual sessions dealing with alcohol and drug dependency and anger management. (Tr. 140-195)   When she was evaluated by her therapist and psychiatrist on December 5, 2001, Marshall again was diagnosed with poly-substance abuse problems and adjustment disorder, but the doctors noted she was in good health. (Tr. 152)

A drug test reviewed by Edgewater on December 11, 2001, showed the presence of cocaine and marijuana metabolites in Marshall's system. (Tr. 150)   Treatment notes indicated Marshall benefitted from the treatment and told her doctors she was learning about her problems and how to solve them. (Tr. 140-195)

4

However, Marshall frequently missed both her group and individual sessions. (Tr. 146, 148, 157)  On January 15, 2002, after fail-ing to respond to letters noting missed appointments, Marshall was discharged from Edgewater for non-compliance. (Tr. 140-141) The discharge diagnosis was poly-substance abuse, adjustment disorder, and a GAF score of 58. (Tr. 140)

While attending Edgewater programs, Marshall repeatedly was seen by cardiologists Dr. Vijay Shah and Dr. Harish Shaw between October 11, 2001 and January 24, 2002. (Tr. 200-201) The echo-cardiogram taken by Dr. Shaw on October 11, 2001, revealed normal systolic function. (Tr. 201)  In later appointments, the doctors noted Marshall still was drinking, had gained weight, and was experiencing back and tooth pain. (Tr. 200)  In one note, Dr. Shaw indicated Marshall demanded Tylenol #3 but was not given a prescription because she was unable to describe the source of her pain. (Tr. 200) Marshall was prescribed Diazide, but during an appointment in November 2001, she indicated that she had not been taking the medication. (Tr. 200) Marshall also complained of shortness of breath while walking and chest pains. (Tr. 200)

Beginning December 22, 2003 and continuing through September 8, 2005, Marshall was seen by Dr. David Chube. (Tr. 252, 256) During his examinations, Dr. Chube noted Marshall complained of headaches, dizziness, chest pain, shortness of breath, and weakness in her neck and back. (Tr. 252, 255-259)

On December 27, 2003, Marshall returned to the Methodist Hospital Emergency Room after experiencing facial swelling and

5

chest pains. (Tr.204)  A portable chest x-ray was ordered, and her heart was found to be of normal size, and her lungs were clear and well expanded. (Tr. 205)  A toxicology report indicated that Marshall was negative for all drugs. (Tr. 212)  Marshall returned to the Methodist Hospital Emergency Room on January 7, 2004, with swelling on the left side of her face. (Tr. 217)  She was instructed to change her facial soap and prescribed Benadryl. (Tr. 218-219)

On January 6, 2004, Marshall reapplied for SSI and DIB, citing a disability onset date of May 15, 2001. (Tr. 52, 270)  In a disability report filled out on January 15, 2004, Marshall indicated that fluid on her heart, obesity, and high blood pressure limited her ability to work. (Tr. 83)  She noted frequent headaches, nosebleeds, chest pain, back pain, and sharp pains in her right leg and ankle. (Tr. 83-84) Marshall reported taking Enalapril and Furosem for her high blood pressure and Potass CL.  (Tr. 87)  The Field Office Disability Report filled out the same day noted that Marshall was clean and neat in appearance, answered questions without difficulty, but turned to a few different positions in her chair during the interview. (Tr. 92) In a disability report completed on January 23, 2004, Marshall indicated that she took care of her personal hygiene and took her medications when she woke up in the morning. (Tr. 94) She also wrote that she cooked and washed dishes and swept the floor at her house. (Tr. 94) Marshall noted she had trouble getting along with people at her prior job because they said she was too "bossy."

6

(Tr. 95) When prompted about her headaches, Marshall wrote that she got headaches three to four times a week and usually laid down until they went away. (Tr. 97)

On March 3, 2004, Marshall was examined by consultative examiner Dr. Herbert White. (Tr. 220) Dr. White noted that Marshall mentioned her hypertension diagnosis in 2001 and her nosebleeds occurring up to four times a week. (Tr. 220) Dr. White also noted that Marshall had a nosebleed on the day of his evaluation. (Tr. 220)  Marshall also alleged that she suffered from headaches and chest pain since 2001 and that she experienced pain in her back and right shoulder from an injury sustained while working in the garden. (Tr. 221) Dr. White found some moderate tenderness in Marshall's right shoulder and her lumbar spine region, but he noted normal range of motion and fine finger manipulation. (Tr. 222-223)  Her muscle strength and grip strength were 5/5, and all deep tendon reflexes were 0/4. (Tr. 223) Dr. White noted that Marshall had mild difficulty in getting on and off the exam table, standing on toes, and standing on heels, moderate difficulty in squatting, and severe difficulty in standing on one leg. (Tr. 224)  Dr. White's final impression of Marshall was that she had obesity, hypertension, headaches, atypical chest pains, and back pain. (Tr. 224)

On March 4, 2004, Marshall was referred to Dr. Patrick McKian for a mental status evaluation. (Tr. 226)  At her appointment, Marshall complained of problems sleeping and feeling irritable, fatigued, and depressed. She stated that she had with-

drawn from people and that she experienced arthritis in her arms
as a result of a stab wound at age ten. (Tr. 227)  Dr. McKian
noted that Marshall had an irritable surly attitude and that she
demonstrated a full range of affect. (Tr. 227)  Dr. McKian also
indicated that Marshall never had received mental health treat-
ment in the past, that she did not have health insurance, and
that she had been denied Medicaid on a couple of requests.  (Tr.
229)  The exam revealed that Marshall sometimes did her laundry
using the laundry machines at the woman's shelter and that she
usually stayed inside and watched TV or listened to the radio.
(Tr. 228)  Dr. McKian's diagnosis was adjustment disorder with
mixed emotional features, in addition to some symptoms of depres-
sion, and he gave her a GAF of 52. (Tr. 229)  He also noted that
Marshall used alcohol about once a week. (Tr. 229)

     On March 25, 2004, Dr. J. Corcoran and Dr. J. Sands com-
pleted a Physical Residual Functional Capacity Assessment of
Marshall. (Tr. 230)  The doctors found that Marshall was able to
lift 20 pounds occasionally and 10 pounds frequently, was able to
stand and/or walk about six hours in an eight-hour workday, sit
for six hours in an eight-hour workday, and had unlimited push
and pull capacity. (Tr. 231)  Moreover, they noted that her
muscle strength was 5/5 throughout and that her grip and fine
finger manipulation were normal. (Tr. 231)  The doctors recorded
that the plaintiff had difficulty squatting and standing on one
leg, had decreased lumbar range of motion, and had some postural
limitations due to her obesity. (Tr. 232)  Dr. Corcoran also

8

indicated that he thought Marshall seemed credible. (Tr. 235)

Dr. K. Neville and Dr. J. Evans completed a psychiatric review technique of Marshall on March 26, 2004, and found that Marshall had an adjustment disorder but that the impairment was not severe. (Tr. 238-250)  The doctors noted that Marshall was independent, cooked, cleaned, did her own laundry, and grocery shopped, and they also determined that Marshall had mild diffi-culties in maintaining social functioning. (Tr. 248, 250)

During Marshall's hearing before ALJ Armstrong on December 15, 2005, she testified that she had gone to AA meetings until either 2002 or 2003, and had last consumed alcohol and used marijuana on her birthday in April 2005. (Tr. 289-290)  Marshall stated that prior to 1998 she had lived with an abusive boy-friend, and after stabbing him and breaking his arm, she moved into a shelter that helped women get off the streets. (Tr. 291) While at the shelter, Marshall indicated she developed relation-ships with the nuns, and one, Sister Loretta, still took her to see her son. (Tr. 291)

Marshall confirmed that the last time she was employed was in February 2001, when she worked in a fast food restaurant making sandwiches, taking orders, and occasionally working the cash register. (Tr. 293)  The job required Marshall to be on her feet for most of the day and included some light lifting of about five or ten pounds. (Tr. 293-294)  Marshall intimated that she had done similar work in the five years preceding 2001, and before that had worked as a CNA. (Tr.294)  The ALJ inquired into

why Marshall left the fast food job, and she responded that the
area had deteriorated and that the restaurant had been robbed
several times. (Tr. 295)  She then indicated that she no longer
could work a fast food job because her right hand was swollen due
to arthritis, and the gout in her legs made it difficult to stand
for a long period of time. (Tr. 296)  Marshall stated that she
was left handed. (Tr. 296)  When the ALJ asked her to open and
close each of her hands, Marshall complained that her right arm
was sore. (Tr. 296)

Next, the ALJ inquired as to whether Marshall could work as
a self-service gas station attendant where she would be sitting
down for the majority of the day. (Tr. 298)  Marshall stated that
she could not work as an attendant because her medication made
her drowsy and the cold air coming in through the windows of the
station would affect her shoulder. (Tr. 298)  Marshall then
stated that she was taking Tylenol #3 with codeine for the pain
in her right shoulder, the arthritis in her right hand, and the
gout, which made her right hand and knees swell. (Tr. 299) Marsh-
all testified that she was not currently looking for a job
because she knew her sickness and medications would hold her back
and make her drowsy. (Tr. 301) Although she had received some
leads from the unemployment office, Marshall indicated she had
been unable to secure a job.  (Tr. 304)

The ALJ then asked Marshall about her discharge from Edge-
water. (Tr. 301) Marshall contended that she was not discharged
for non-compliance but rather left the program because she did

10

not think it was helping her recover. (Tr. 302)  Marshall then
noted she sat in on some programs conducted by Sister Loretta
from the woman's shelter to ensure that she was able to remain
off of drugs and alcohol. (Tr. 302)

Marshall testified that she had difficulty dealing with
people and an attitude problem especially when taking orders.
(Tr. 308)  Marshall stated that she suffered from depression and
anxiety about receiving her township supplemented income, had
thought about committing suicide on various occasions, and some-
times got so depressed that she could not get out of bed for an
entire day. (Tr. 309-311) The ALJ also established that Marshall
weighed 253 pounds, which qualified her as obese. (Tr. 314)

Medical expert Dr. Walter Miller testified that many of
Marshall's problems were a result of her past alcohol abuse. (Tr.
312)  He intimated that her heart failure, acute hepatitis, and
enlarged liver could be reversed by cessation of drinking. (Tr.
312) Dr. Miller then testified that Marshall could do a full
range of light work and agreed with the RFC determination in the
record. (Tr. 313)  Miller also spoke about the claimant's psychi-
atric impairments, and he opined that her actual dysfunction was
not to the level of lack of social contact.  However, he admitted
that he was not a psychiatrist. (Tr. 314)

Next, the ALJ provided a series of hypothetical questions to
the vocational expert, Pamela Tucker. (Tr. 315)  The first hypo-
thetical was based on an individual limited to light exertional
duties, simple routine work, and no work at unprotected heights

11

or on dangerous, moving machinery, open flames, or bodies of water. (Tr. 315)  The VE indicated that this individual would be able to return to work as a fast food worker. (Tr. 316)  The ALJ then asked if the same individual, further limited to no more than superficial contact with supervisors, coworkers, and the general public, would be able to be a fast food worker. (Tr. 316)  The VE responded "no" but testified that there was work in the regional or national economy that such a person could do, such as a housekeeper, a laundry worker, and a night office cleaner. (Tr. 316)  In the next hypothetical, the ALJ assumed that the same individual, with the same limitations, also was limited to sedentary exertional duties. (Tr. 316)  The VE testified that this individual could work as a bench assembler, hand packer, and inspector/checker. (Tr. 317)  Next the ALJ asked whether there would be work for an individual with all the above limitations, in addition to difficulty with fine finger manipulation, and the VE responded that the same employment opportunities would be available. (Tr. 317)  Then the ALJ inquired into whether an individual with all the above limitations except difficulty with fine finger manipulation, but difficulty concentrating due to side-effects of medication, could do the prior listed jobs. (Tr. 318)  The VE responded that the individual could not do the identified jobs. (Tr. 318)  Finally, the ALJ assumed that the same individual could concentrate but would miss more than two days of work a month due to occasional exacerbation of pain and swelling in the legs. (Tr. 318)  The VE intimated that this individual

12

would not be able to do any of the mentioned work. (Tr. 318)

The ALJ denied benefits in a written decision on February 10, 2006. (Tr. 17)  The ALJ concluded that Marshall's obesity was a severe impairment but not medically equivalent to a listed impairment. (Tr. 20-21) He opined that while pain and swelling in the legs and shoulder was a reasonable symptom of obesity, the credibility of Marshall's statements concerning the intensity, duration, and limiting effects of these symptoms was questionable. (Tr. 21) The ALJ indicated that Marshall did not report severe pain, headaches, or difficulty standing to her physicians and that she had not been considered for any treatment for her physical complaints other than pain medication. (Tr. 21) He also commented that Marshall was not referred for x-rays or Magnetic Resonance Imaging and had been non-complaint with mental health treatment. (Tr. 21)  Moreover, since there was no RFC assessment from a treating physician, the ALJ relied on the RFC assessment conducted by the State, which had found that Marshall was capable of performing light work. (Tr. 21)

The ALJ concluded that since the claimant was able to perform light work, she could return to her prior employment as a fast food worker. (Tr. 22)  Moreover, based on the RFC assessment, the ALJ indicated that the claimant could perform other work in the regional economy, including 12,000 jobs as a housekeeper, 1,000 as a laundry worker, and 7,000 as a night office cleaner. (Tr. 22)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable

14

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled
and the evaluation process is over; if she is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
§404.1520(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of her past work.  If, at this fourth step,
the claimant can perform her past relevant work, she will be
found not disabled.  20 C.F.R. §404.1520(e).  However, if the
claimant shows that her impairment is so severe that she is

unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Marshall initially challenges the ALJ's determination that obesity was her only severe impairment.  Step two analysis requires that the claimant establish she suffers from a medically determinable physical or mental impairment that has lasted, or is expected to last, for a continuous period of at least 12 months. 20 C.F.R. §§404.1520 (a)-(c), 416.909.  Severity, however, is merely a threshold analysis that requires the claimant only to show she has at least one severe impairment. *Bradley v. Barnhart*, 175 Fed. Appx. 87, 90 (7th Cir. 2006); *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 1999); *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) ("It is quite apparent that severity is merely a threshold requirement.").  ALJ Armstrong did find that Marshall had a severe impairment, obesity, and thus proceeded at step three to examine whether the impairment qualified as a listed impairment.

However, Marshall also criticizes the ALJ for using the faulty step two determination in assessing her RFC at step three. The RFC is an assessment of the work-related activities the claimant can perform despite her limitations. 20 C.F.R. §404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir.

16

2004). When determining the extent of a claimant's disability,
the ALJ must consider physical abilities, mental abilities, and
all other impairments, including those that are not severe.  20
C.F.R. §404.1545(a)(2); *Young*, 363 F.3d at 1001.  In making the
RFC assessment, the ALJ can rely on the conclusions of qualified
medical professionals. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir.
1993).

In his opinion, the ALJ stated that he carefully considered
all symptoms in the record before making the RFC determination.
(Tr. 21) The opinion included a discussion of not only the
claimant's obesity and the resulting symptoms, but also the
claimant's alleged back, neck, and shoulder pain, along with
constant drowsiness. (Tr. 21)  This is consistent with RFC
evaluations that require consideration of all medically determi-
nable impairments, both severe and non-severe.  There is no
indication that the ALJ only considered obesity when determining
Marshall's RFC. 20 C.F.R. §404.1545(a)(2).

Marshall next objects to the ALJ's conclusions that her
allegations were not fully credible.  While the ALJ must weigh
all credible evidence to make an unbiased finding, he is not
required to accept the claimant's testimony regarding a disabil-
ity or impairment and can make credibility determinations.  *Cass*,
8 F.3d at 555.  This court will sustain the ALJ's credibility
determination unless it is "patently wrong." *Nelson v. Apfel*, 131
F.3d 1228, 1237 (7th Cir. 1997).  The ALJ's unique position to

observe the witness entitles great deference to his opinion.
*Nelson,* 131 F.3d at 1237.

The ALJ must take into consideration all of the claimant's
symptoms, including pain, that are reasonably consistent with the
objective medical evidence.  20 C.F.R. §404.1529(a); *Scheck v.
Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).  The ALJ then must
evaluate the intensity and persistence of the claimant's symptoms
through consideration of the claimant's "medical history, the
medical signs and laboratory findings, and statements from [the
claimant, the claimant's] treating or examining physician or
psychologist, or other persons about how [the claimant's] symp-
toms affect [the claimant]."  20 C.F.R. §404.1529(c).  The ALJ is
required to "articulate specific reasons for discounting a
claimant's testimony as being less than credible" and is pre-
cluded from simply ignoring the claimant's testimony.  *Schmidt*,
395 F.3d at 746.

Although a claimant's complaints of pain cannot be totally
unsupported by the medical evidence, the ALJ may not make a
credibility determination "solely on the basis of objective
medical evidence." SSR 96-7p.  If the claimant indicates that
pain is a significant factor in her inability to work, the ALJ
must explore how the pain impacts the claimant's daily activities
and take into consideration observations of treating and examin-
ing physicians, the intensity of the claimant's pain, any aggra-
vating factors, and prescribed pain medications and other pain
relief treatment.  *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.

18

1994).  Furthermore, the ALJ must make more than a single conclu-
sory statement when discounting the claimant's description of
pain and must assess both evidence favorable and unfavorable to
the claimant. SSR 96-7p; *Zurawski v. Halter*, 245 F.3d 881, 888
(7th Cir. 2001) (*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th
Cir. 1986)).  The decision must contain specific reasons for the
credibility finding, supported by the evidence in the case
record, and "must be sufficiently specific to make clear to the
individual and to any subsequent reviewers the weight the adjudi-
cator gave to the individual's statements and reasons for that
weight." SSR 96-7p. See *Zurawski*, 245 F.3d at 887.  The ALJ must
"build an accurate and logical bridge from the evidence to [his]
conclusion." *Young*, 363 F.3d at 1003; *Steele v. Barnhart*, 290
F.3d 936, 941 (7th Cir. 2002) (*citing* *Dixon v. Massanari*, 270
F.3d 1171, 1176 (7th Cir. 2001)); *Clifford v. Apfel*, 227 F.3d
863, 872 (7th Cir. 2000).

Moreover, the ability to perform minimal daily activities
does not undermine a claim of disabling pain. *Clifford*, 227 F.3d
at 872.  In assessing a claimant's ability to be employed outside
of the home, the ALJ should not place undue weight on a claim-
ant's household activities, as there is a distinct difference
between a person's ability to engage in sporadic physical activi-
ty and being able to work for five consecutive days. *Carradine
v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) ("[The ALJ] failed
to consider the difference between a person's ability to engage
in sporadic physical activities and her being able to work eight

19

hours a day for five consecutive days of the week."). Addition-
ally, the ALJ cannot infer lack of credibility simply from lack
of treatment and must not draw any inferences about failure to
seek treatment without first considering any explanation that the
individual may provide. SSR 96-7p; *Elliot v. Barnhart*, 2005 U.S.
Dist. LEXIS 22510 at *21 (N.D. Ind. Oct. 4, 2005).

The ALJ found Marshall's testimony partially credible and
stated that, while the medical evidence and other evidence sup-
ported the nature of Marshall's symptoms, the intensity, dura-
tion, and limiting effects of the symptoms were not entirely
supported. (Tr. 21) In discounting Marshall's testimony, the ALJ
first pointed to her daily activities and noted that other than
taking care of her personal needs in the morning, "all she does
is wash dishes and sweep." (Tr. 21) The ALJ did not explain why
this statement diminished Marshall's credibility, and it is
unclear why these minimal tasks undermined her complaints. To
the extent that the ALJ relied on evidence that Marshall washed
dishes and swept, there is no indication in the record that these
activities occurred with a frequency that was comparable to a
normal work environment. On remand, the ALJ should conduct a more
focused inquiry into Marshall's daily activities to determine the
extent of her pain and the extent of her ability to perform tasks
that would be comparable to sustained activity in a normal work
environment. *See Zurawski*, 245 F.3d at 887.

The ALJ also concluded that Marshall failed to report severe
pain, headaches, or problems standing to her physicians. How-

ever, the record does not reflect a complete failure to report these symptoms. Marshall first complained of headaches at a visit to the Methodist Hospital Emergency Room on May 16, 2001. (Tr. 127) Marshall also reported headaches to Dr. Chube on August 9, 2005, and to a variety of sources throughout the disability determination process. (Tr. 256, 97, 221).  While a discrepancy between the degree of pain claimed by Marshall and that suggested by the medical record can be probative of exaggeration, on remand the ALJ must consider all of the evidence and specifically state the evidence contradicting her claims. ***Sienkiewicz v. Barnhart***, 409 F.3d 798 (7th Cir. 2005); ***Zurawski***, 245 F.3d at 888***; Elliot***, 2005 U.S. Dist. LEXIS 22510 at *21.

Additionally, the ALJ contended that other than being prescribed pain medication, Marshall had not been considered for any other medical procedures.  Marshall argues that this line of reasoning faults her for being too poor to seek treatment for her ailments.  This argument is misplaced. The ALJ did not fault Marshall for the failure to seek further care. Rather, the ALJ commented that Marshall's physicians did not indicate the neces- sity of further treatment.  There is no evidence of further treatment for severe pain in the record.

Furthermore, the ALJ noted Marshall's non-compliance with mental health treatment.  At her hearing, the ALJ probed Marshall about leaving the Edgewater System, but the explanation Marshall offered for her departure was not considered in the decision. (Tr. 301-302) To the extent this evidence was a basis for the

21

ALJ's credibility determination, on remand, the ALJ should explicitly consider why Marshall stopped participating in the Edgewater program before penalizing her for non-compliance.

Marshall's final objection to the ALJ's RFC determination is that it did not incorporate all of her impairments, specifically her mental impairment.  The Commissioner is bound by his own regulations and rulings. ***Pope v. Shalala***, 998 F.2d 473, 486 (7th Cir. 1993).  Because an RFC determination includes consideration of all evidence, when a claimant presents evidence of mental impairment, the ALJ is required to evaluate the impairment using the special technique prescribed in 20 C.F.R. §416.920a(a). ***Salinas v. Barnhart***, 2004 WL 1660904 at *8 (N.D. Ill. July 19, 2004); ***Wegner v. Barnhart***, 2003 U.S. Dist. LEXIS 25119 at *29 (W.D. Wis. May 12, 2003) (*aff'd* 105 Fed. Appx. 80 (7th Cir. 2004)). Under this regulation, the ALJ first must evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether there is a medically determinable impairment. 20 C.F.R. §416.920a(b)(1).  If a medically determinable mental impairment is found, the ALJ then must rate the degree of func- tional limitation resulting from the impairments in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensa- tion. 20 C.F.R. §§416.920a(b)(2), (c)(2), (c)(3).  The ALJ must rate the claimant in each of these categories using a five point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. §416.920 a(c)(4).  Claimants found to have none or a mild func-

tional loss  usually are not deemed to have a severe mental
impairment.  *See* **Wegner**, 2003 U.S. Dist. LEXIS at *30.  The ALJ
must document application of this technique by including a
specific finding as to the degree of limitation in each of these
functional areas in his decision.  20 C.F.R. §416.920a(e)(2).  *See*
**Salinas**, 2004 WL 1660904 at *8.

Marshall faults the ALJ for not requesting a medical source
statement (MSS) from Dr. McKian as part of his psychological
examination of the claimant.  Although an MSS ordinarily is
requested as part of the consultative examination process, the
absence of an MSS does not make the report incomplete.  20 C.F.R.
§404.1519n(c)(6).  An MSS in this case, however, could illuminate
the limitations imposed by Marshall's mental impairment, and on
remand, the ALJ may order one to better understand the effect
Marshall's mental impairment has on her ability to function in
the workplace.

Although an MSS was not required, Marshall did allege that a
mental impairment precluded her from participating in gainful
activities, thus the ALJ was required to evaluate the severity
and impact of the impairment under the special technique pre-
scribed in 20 C.F.R. §404.1520a of the Social Security Regula-
tions.  *See* **Salinas**, 2004 WL 1660904 (N.D. Ill. July 19, 2004);
**Wegner**, 2003 U.S. Dist. LEXIS 25119.  There was ample evidence of
mental impairment presented, including a diagnosis of Adjustment
Disorder from both Edgewater Systems and Dr. McKian. (Tr. 197,
229)  The ALJ's decision, however, does not document application

23

of this technique or even mention a mental RFC determination.  On remand, the ALJ should conduct a mental RFC determination through application of the special technique and take this into consideration when determining the claimant's overall limitations.

Marshall's final arguments are that the evidence does not support the ALJ's decision that she could return to work and that the hypothetical questions posed to the vocational expert were incomplete because they did not incorporate limitations caused by her right shoulder pain, gout, swelling in the knees, difficulty in the repeated use of her hands and finger, adjustment disorder, and difficulty walking and standing.  In assessing whether a claimant can perform the demands of a prior job, the ALJ cannot describe the job in a generic manner and conclude, on the basis on the claimant's RFC, that she can return to the job.  *Nolan v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991); *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984).  The ALJ must specify the duties involved in performing the job and access the claimant's ability to perform the specific tasks, especially when there is evidence that the claimant's condition has worsened since she was last employed.  *Nolan*, 939 F.2d at 519; *Strittmatter*, 729 F.2d at 509.

In the hypothetical questions, the ALJ must include all limitations supported by medical evidence in the record.  *Steele,* 290 F.3d at 942.  This requirement ensures that the vocational expert only refers to jobs that the claimant can perform despite her full range of limitations.  *Steele*, 290 F.3d at 942.  An

24

exception to this rule exists when the "vocational expert inde-
pendently learned of the limitations (through other questioning
at the hearing or outside review of the medical records, for
example) and presumably accounted for them." **Steele**, 290 F.3d at
942.  For this exception to apply, the vocational expert must
have reviewed the claimant's medical evidence and have been
present during the claimant's administrative hearing testimony.
***Ragsdale v. Shalala***, 53 F.3d 816, 818 (7th Cir. 1995).

   Even though it is unclear whether Marshall's condition has
worsened since she last was employed, the ALJ did not determine
the specific demands of a fast food job and assess whether
Marshall could perform these tasks despite her specific limita-
tions.  During the hearing, the ALJ asked Marshall about the
specific tasks she performed as a fast food worker, but these
were not incorporated into the decision.  For example, the ALJ
did not consider Marshall's claim that she could not stand for
long periods of time because of her gout, even though she testi-
fied that as a fast food worker she spent most of the day on her
feet. (Tr. 293)  On remand, the ALJ must analyze whether Mar-
shall, as limited by her full range of impairments, can perform
each task assigned to a fast food worker.  The ALJ must undertake
a new step five determination reflective of this decision.

———————————

   For the foregoing reasons, the decision of the Commissioner
is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C.

§405(g). On remand, the ALJ is directed to reevaluate Marshall's claim consistent with this opinion.

ENTERED this 25th day of September, 2007

s/ ANDREW P. RODOVICH
United States Magistrate Judge

26